**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Henry Idowu SILVA; Edna Silva a/k/a
Edna O. McDaniel,
Defendants–Appellants.**

No. 87–3075.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 28, 1987.

Decided May 4, 1988.

James A. Levin argued, Cleveland, Ohio, for defendants-appellants.

Linda M. Betzer argued, Asst. U.S. Atty., Cleveland, Ohio, for plaintiff-appellee.

Before KEITH, MILBURN and NORRIS, Circuit Judges.

KEITH, Circuit Judge.

Defendant Henry I. Silva appeals from his conviction after trial by jury for conspiracy to distribute heroin; possession with intent to distribute heroin; and distribution of heroin; in violation of 21 U.S.C. § 846; 21 U.S.C. §§ 841(a)(1) and 845(a); and 18 U.S.C. § 2. Defendant Edna O. McDaniel appeals from her conviction after trial by jury for conspiracy to distribute heroin and conspiracy to possess with the intent to distribute heroin. For the reasons set forth below, we AFFIRM.

**I.**

In late 1985, the FBI began an investigation of Henry Silva based on information from a confidential informant that Silva was engaged in the distribution of heroin. In the course of its investigation, the FBI paid a second informant, Doris Campbell, to set up and to conclude heroin transactions with Silva, providing money to Campbell for the purchases. The first transaction occurred on January 22, 1986. After making arrangements for the exchange via a telephone conversation between Silva and

Campbell (a communication which was monitored, but not taped, by FBI agents), McDaniel made a controlled sale of one gram of heroin to Campbell. This sale was followed by similar transactions on February 3, 1986 and February 19, 1986. During the latter transaction, Campbell introduced McDaniel to "Linda Brady," in reality Special Agent Berry of the FBI.

The next transaction, which was to be for two grams of heroin, took place on March 21, 1986, pursuant to arrangements made through a telephone conversation between Campbell and Silva. After being called by Campbell, Silva arrived at the gas station which had been selected by Silva as the site for the purchase and had a brief conversation with Berry and Campbell. Silva then asked Campbell to accompany him to his car, where he sold her one gram of heroin, claiming that he had forgotten the second gram. Silva asked Campbell to meet him at the site of the February 3rd transaction. When they met again some seven or eight minutes later, Silva handed the second gram of heroin to Campbell.

In April, 1986, Special Agent Berry began speaking directly to Silva over the telephone to arrange transactions. These conversations were recorded, and were introduced at trial against the defendants. The April conversations led to a meeting between Berry and Silva on April 24, 1986. After "patting" Berry down, Silva sold her two grams of heroin.

In July, 1986, after several telephone conversations (which were also recorded), Silva and Berry met to discuss a larger transaction. Silva agreed to sell Berry sixteen ounces of heroin for $80,000 on the following Wednesday, July 24. However, on that date, Silva told Berry that his "party" (supplier) wanted to be sure that the money was not "funny" (counterfeit); therefore, the transaction that day would be for only $1,200.00. Later that day, Berry and Case Agent Crawford met Silva and a friend at a hotel, where Crawford paid Silva the $1,200.00 in exchange for a bindle (a wrapped packet) of heroin.

Silva and McDaniel were arrested on July 28, 1986. Silva was charged with conspiracy to distribute heroin and conspiracy to possess with intent to distribute heroin (Count 1); aiding and abetting the distribution and possession with the intent to distribute heroin (Counts II, IV and VIII); distribution of and possession with the intent to distribute heroin (Counts III, VI and VII); and distribution of and possession with the intent to distribute heroin within one thousand (1,000) feet of a public school (Count V). McDaniel was charged in Count I with conspiracy to distribute heroin and conspiracy to possess with the intent to distribute heroin, and in Counts II and IV with the distribution of and possession with the intent to distribute heroin.

At trial, Silva raised the defense of entrapment. In addition to arguing that the Government had failed to establish predisposition, Silva testified that the heroin involved in the controlled transactions was supplied by the Government; and that, therefore, he had been entrapped as a matter of law. McDaniel argued that the Government had failed to prove that she had knowingly and willingly entered into the alleged conspiracy. Appellants' motions for directed verdicts were denied. Silva was subsequently convicted on all eight counts. McDaniel, however, was convicted on Count I only, as verdicts of not guilty were rendered on Counts II and IV. This appeal followed.

## II.

Initially, Silva argues that the conduct of the Government constituted entrapment as a matter of law. At trial, Silva testified that he received the heroin which he sold to the Government agents from Campbell, and that the evidence that the Government was the sole source was undisputed.

■ We note initially, insofar as Silva grounds his claim of entrapment on his allegation that the Government supplied the heroin which it accused him of selling, that such a defense is not available to him. *Hampton v. United States*, 425 U.S. 484 (plurality opinion), 491, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (Powell and Blackmun, J.J. concurring) (1976); *United States v. Rus-*

*sell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Hampton*, the plurality opinion rejected the view that the Government's supplying of heroin to one later prosecuted for trafficking in the supplied contraband constituted a *per se* denial of due process. 425 U.S. at 488–91, 96 S.Ct. at 1649–50. Moreover, Silva fails to allege any further facts which reveal governmental conduct so egregious as to enable him to base his entrapment defense on due process grounds. *See Hampton*, 425 U.S. at 491–95, 96 S.Ct. at 1650–52; *United States v. Kaminski*, 703 F.2d 1004, 1007 (7th Cir. 1983).

■ Therefore, any claim of entrapment as a matter of law must be based on a failure by the Government to prove predisposition. Moreover, in order to constitute entrapment as a matter of law, "the testimony and facts [showing an absence of predisposition] must be undisputed; a court may not choose between conflicting testimony or make credibility determinations." *United States v. Pennell*, 737 F.2d 521, 534 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985) (citing *Sherman v. United States*, 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958)). "Furthermore, the undisputed evidence must demonstrate a 'patently' clear absence of predisposition." *Pennell*, 737 F.2d at 534, citing *United States v. Henciar*, 568 F.2d 489, 491 (6th Cir.1977), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978). In determining whether there was no predisposition as a matter of law, we are required to view the evidence in the light most favorable to the Government, and resolve all reasonable inferences in favor of the Government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984).

"Predisposition ... is, by definition, the defendant's state of mind *before his initial exposure to government agents*." *McLernon*, 746 F.2d at 1112 (emphasis in original). As this court stated in *McLernon*, the factors relevant to determining a defendant's prior disposition include:

[T]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

746 F.2d at 1112.

■ It cannot seriously be argued that the evidence showing a lack of predisposition was undisputed, or that the evidence, undisputed or otherwise, demonstrated a "patently clear" absence of predisposition. Although neither Silva nor his wife had any prior criminal record at the time of the first contact, and the suggestion that Silva sell heroin to Campbell was initially made by the Government, "... [t]he most important factor in determining the lack of predisposition as a matter of law ... is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducements." *McLernon*, 746 F.2d at 1113; *Kaminski*, 703 F.2d at 1008. Here, the transcripts reveal a willing participation in drug trafficking on the part of Silva as evidenced by, for example, the first recorded conversations of April 4, 1986:

\* \* \* \* \* \*

Berry: Okay. Hey, I'm wondering if we could get together one day next week? I need the same thing.

Silva: Next week?

Berry: Yeah. Anytime next week.

Silva: Okay. What day?

Berry: It's up to you. You, uh, you, can you help me out? You have, you have anything?

Silva: Yeah.

Berry: I need two.

Silva: Okay. When?

Berry: Uh Tuesday?

Silva: Okay.

Berry: Okay. What time?

Silva: Did you talk to her about it?

Silva: Doris.

Berry: Well, I'll put it like this, uh I don't need to know her business and she doesn't need to know mine, right?

Silva: Okay.

Berry: You know what I'm saying?

Silva: Yeah.

Berry: I mean we can, we can work together you know. Right? Can we?

Silva: Yeah. Now, the business of drugs I sell (unintelligible).

&ast; &ast; &ast; &ast; &ast; &ast;

Berry: Oh okay. So are we set up?

Silva: Uh yeah. I gotta get to my man and call me back Tuesday. I'll let you know.

Berry: You want me to call you on Tuesday morning?

Silva: Make it noon.

Berry: Make it ...

Silva: Cause I have to reach my man before I say anything.

Berry: Oh okay.

&ast; &ast; &ast; &ast; &ast; &ast;

(Government Exhibit 9A: April 4, 1986)

The facts of this case are not comparable to those found in, for example, *McLernon, supra*, where a lack of predisposition was found as a matter of law. In *McLernon*, the Government agent, among other things, told the defendant that the agent could arrange marketing and distributorships for the defendant's legitimate business products, presenting the drug transaction as a *quid pro quo*. Moreover, the agent developed such a relationship with the defendant that the two performed the Indian ritual of becoming "blood brothers," and the agent exploited this relationship in inducing the defendant to enter into the conspiracy. 746 F.2d at 1112–14. Here, Silva appears as a person involved in relatively routine drug deals, whose only inducement is the profits to be realized therefrom.

Silva argues that the two-month interval between the initial contact and the first recordings vitiates any finding drawn from those recordings that predisposition existed at the time of the initial contact.[1] However, a reasonable inference could be drawn from Silva's familiarity with drug transaction terminology and procedure that Silva's predisposition predated the first recorded conversation by at least two months. Silva, on the tapes, converses with Berry in the shorthand of one acclimated to the world of heroin distribution:

&ast; &ast; &ast; &ast; &ast; &ast;

Berry: Okay well. Uh I know you don't particularly like to talk on the phone. But.

Silva: No.

Berry: Okay can. Maybe we should get together and talk because ...

Silva: That will be, that will be fine.

Berry: Its quite a bit more.

Silva: Really!

Berry: Yeah like, you know OZ.[2]

Silva: Un huh. I yea. If your [sic] talking about that.

Berry: Uh hmm.

Silva: I'm ready.

Berry: Your [sic] ready?

Silva; I'm, I'm positive. If you want more than that I'm ready.

Berry: Can you do it then, Monday?

Silva: You bet I will.

Berry: Oh on Monday?

Silva: Yeah.

Berry: Okay so you know what I'm talking about right?

Silva: Yes I do.

Berry: Oh okay. How much would I owe you?

Silva: Uh, five five.

Berry: Five five.

Silva: Yeah.

Berry: Okay.

---

**1.** The date of "first contact" appears to be January 22, 1986. Although Campbell had some prior contact with Silva, this is the first date that Campbell dealt with Silva as a Government informant.

**2.** Special Agent Berry testified that "OZ" was a street phrase for ounces of heroin.

Silva: Alright.

\* \* \* \* \* \*

(Government Exhibit 12A: July 17, 1986). Silva also displays his knowledge of procedures for exchanging contraband for money:

\* \* \* \* \* \*

Silva: Okay. What I'll do a, talking about 16 ounces now, talking about 16 ounces 4, 8, 12, four eight, twelve need four more to make 16. Okay, 16 will be ready by 7:00 p.m., Wednesday evening.

Berry: Okay.

Silva: But before then at about four o'clock....

Berry: Tomorrow?

Silva: .... a, I have to go and get a sample. That—don't stay here with me that much.

Berry: Okay.

Silva: Uh, I'll still have to fly out right now, okay?

Berry: Un huh.

Silva: When I come with the sample I'll call you at about four, five o'clock Wednesday evening.

Berry: Okay.

Silva: I'll hand over to you the sample.

Berry: Okay.

Silva: I'll give you all evening, all night to run whatever tests you want, let him test it, let him see if he wants it, okay?

Berry: Okay.

Silva: Uh, cause that's not gonna be nothing but a gram or so.

Berry: Right.

Silva: Tell him to run and check everything out okay?

Berry: Okay.

Silva: When he does that, at that point and time, you give me a call.

Berry: Okay.

Silva: That everything is super.

Berry: Alright.

Silva: Then we would, think if it's between you and myself I can afford for you to have the money in your car and I'll have the shit in my car.

Berry: Okay.

Silva: We'll meet somewhere and then go somewhere and make an even exchange, you got my number, I got your number.

\* \* \* \* \* \*

(Government Exhibit 15 A: July 21, 1986). The evidence concerning predisposition was not undisputed; consequently, there was no entrapment as a matter of law.

### III.

■ Next, Silva argues that the government failed to establish predisposition beyond a reasonable doubt. In order to sustain this claim of insufficient evidence, we must conclude that no reasonable juror could conclude beyond a reasonable doubt that appellants were predisposed to traffic in heroin. *McLernon*, 746 F.2d at 1111.

Much of our discussion concerning the absence of entrapment as a matter of law is applicable here. From the evidence presented by the Government, a reasonable juror could have concluded that appellants exhibited little reluctance to engage in heroin distribution, that no excessive inducement was offered, and that, indeed, appellants were willing and able participants. *See McLernon*, 746 F.2d at 1112; *Kaminski*, 703 F.2d at 1008.

### IV.

As noted above, McDaniel was convicted of conspiracy, but acquitted of both substantive counts of distribution and possession with intent to distribute. McDaniel now argues that her acquittal of the substantive counts, where she admitted every element of the substantive counts except for "knowingly and intentionally" transacting in heroin,[3] was inconsistent with a finding that she had the requisite intent and knowledge for purposes of the conspiracy count.

■ However, it is clear that a defendant may not upset a verdict solely because

---

3. At trial, McDaniel conceded that she, in fact, did deliver the enclosed packages. Her sole defense was that she was unaware that the bindles contained heroin.

**358**

the verdict is not reconcilable with other verdicts rendered for or against the defendant. *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction, the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Powell*, 469 U.S. at 64–65, 105 S.Ct. at 476 (quoting *Dunn*, 482 U.S. at 393, 52 S.Ct. at 190). "It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the [conspiracy count], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [substantive offenses]." *Powell*, 469 U.S. at 65, 105 S.Ct. at 476.

To accept McDaniel's argument is to assume that her acquittal on the substantive counts was proper—"the one the jury 'really meant.'" *Powell*, 469 U.S. at 68, 105 S.Ct. at 478. However, if the jury was mistaken, it is just as possible that it was mistaken in its acquittal on the substantive counts as in its conviction on the conspiracy count. The jury could also have determined that McDaniel was in fact guilty of the substantive offenses, but that lenity was called for under the circumstances. However, whatever the reason for the verdicts, any speculation to that end is simply irrelevant in light of *Dunn* and *Powell*.[4]

McDaniel is therefore limited to her claim that evidence adduced at trial was insufficient to support her conviction on the conspiracy counts. Viewing the evidence in a light most favorable to the Government, however, we conclude that substantial evidence existed that she knowingly and willingly entered into the conspiracy. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469.

McDaniel claimed at trial that she did not know that the bindles contained heroin, but that she was told that they contained gemstones; however, it is clear that the obstensibly innocuous packages of "gems" were wrapped and sealed with masking tape, so that their contents would not be visible, and that McDaniel conveyed them in a surreptitious manner. Moreover, McDaniel denied at trial that she received no money from Berry during the January 22, 1986 transaction; Berry testified that she had given Campbell $400.00 for the sale, and that she had observed Campbell in the act of giving the money to McDaniel. A jury could easily have concluded that McDaniel's story was not credible.

**V.**

Accordingly, for the foregoing reasons, the judgments of conviction are AFFIRMED.

---

4. We also note that, although the overt acts alleged in the indictment in support of Count I, insofar as they personally involved McDaniel, are identical to the substantive counts, acquittal on the substantive counts does not invalidate her conviction for conspiracy. First, the rationale of *Powell* and *Dunn* would certainly preclude such a finding, Second, in a § 846 conspiracy prosecution, the Government need not allege or prove *any* overt acts. *United States v. Dempsey,* 733 F.2d 392, 396 (6th Cir.), *cert. de-* *nied,* 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984). Third, if the Government does allege any overt acts in the indictment, it need only prove that *one* of the alleged acts was committed by *any one* of the conspirators. *United States v. Kirk,* 584 F.2d 773, 782 (6th Cir.) *cert. denied,* 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 708 (1978). Because Silva was convicted of substantive counts which mirrored alleged overt acts Three, Six, and Seven, the Government met its burden in this regard.