878 F.2d 382
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert C. LABINE, Defendant-Appellant.
 Nos. 88-1145, 88-1146.
 United States Court of Appeals, Sixth Circuit.
 July 3, 1989.
 
 Before RALPH B. GUY, Jr. and RYAN, Circuit Judges, and DAVID D. DOWD, District Judge*.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Defendant, Robert C. LaBine, appeals his conviction on three counts of mail fraud and one count of submitting false statements in a loan application to a federally insured bank. 18 U.S.C. Sec. 1341 and 18 U.S.C. Sec. 1014. The mail fraud counts and the false statement count were actually contained in two separate indictments which were consolidated for trial. The false statement indictment was returned on January 22, 1987, and the mail fraud indictment was returned on April 10, 1987.
 
 
 2
 On appeal, LaBine argues that these convictions should be reversed because of pre-indictment delay and insufficiency of the evidence. Upon review, we find both contentions lacking in merit and affirm.
 
 I.
 
 3
 The events leading up to this prosecution began in 1981 when LaBine and co-defendant Armand Dion formed a partnership, LaBine & Dion.[1] LaBine and Dion both were life insurance agents in the Flint, Michigan, area and had shared office space. Prior to entering into the formal partnership, Dion's name had been added to the assumed name certificate for "Professional Associates," the style under which LaBine had been operating. LaBine, in addition to selling life insurance, also had been promoting a tax shelter scheme involving the leasing of master recordings from the Koala Record Company of Hendersonville, Tennessee. Professional Associates also had an "escrow account," and LaBine sold interests to the public in this account.
 
 
 4
 Sometime in the early 1980s, both the Securities and Exchange Commission (SEC) and the Internal Revenue Service (IRS) began investigating defendant's activities. The SEC claimed that unregistered securities were being sold,[2] and the IRS felt the tax shelter was a sham.[3] In May of 1982, at the request of the SEC, a preliminary injunction was issued against Professional Associates, its assets were frozen, and a receiver was appointed. As of this date, there were 610 investors in the trust fund with a total investment of $5.5 million.
 
 
 5
 The various agencies, including the Federal Bureau of Investigation (FBI) which was then involved, made a detailed investigation of what was done with the funds contributed by the investors. We find it unnecessary to present other than a brief overview. Defendant bought $1.7 million worth of diamonds at a time when the diamond market was declining. He purchased a number of parcels of real estate which were occupied by his relatives and which generated no income. Loans in the amount of $529,000.00 were taken out, secured in part by partnership assets, and never repaid. LaBine made a $379,000.00 loan to a personal friend to finance a catering business which never made any money. The loan was never repaid. A total of $539,000.00 was loaned to 92 different individuals who then invested the loan proceeds in the Koala Record Company, and LaBine received a commission from each investment. The loans were unsecured.
 
 
 6
 LaBine also began looking for another tax shelter program and loaned $200,000.00 to Product Development Institute, Inc. (PDI), in March of 1982. PDI was attempting to develop a Wind Jenny, a type of windmill designed to generate electricity. Since this product, if successful, would be an energy saving device, investments in its development arguably could generate investment tax credits. LaBine also purchased six Wind Jennies from PDI for $102,000.00. The Wind Jennies were used as prototypes in contemplation of the investment tax credit program that Professional Associates was planning to promote and sell. The Wind Jennies were erected in Montana and Michigan. For the short time they were in operation, they suffered from mechanical failures and never generated electricity that was sold for profit.
 
 
 7
 Professional Associates also invested in money market accounts and purchased twenty-seven mortgages for $415,000.00 which did generate income. LaBine did not inform the trust investors that their money was being used to buy real estate for his family, to provide operating capital for his business partnership, or to finance the highly speculative business ventures of a close friend and of companies for which he acted as an agent and from which he received or was to receive commissions. The records kept by Professional Associates for each trust investor were skeletal. Each trust investor's account would typically include both cash and non-cash assets. For example, an investor's account might consist of diamonds, part of a loan receivable, and cash. Each trust investor received a March 31, 1982, statement of account which, regardless of which assets were in the investor's account, stated that the annualized rate of return was 17.36%.
 
 
 8
 In January 1982, LaBine applied for a $50,000.00 loan from the Michigan National Bank. He submitted a joint financial statement for himself and his wife on which he falsely stated that he was the sole owner of a number of assets actually owned by the trust investors. LaBine also falsely stated that his wife had an unencumbered $120,000.00 of equity in a residential property.
 
 II.
 Pre-Indictment Delay
 
 9
 The mail fraud indictment that was returned against LaBine contained twelve counts, one of which charged a conspiracy. Of the eleven substantive counts, counts two through nine related to a mailing on April 24, 1982. Counts ten through twelve related to a May 21, 1982, mailing to three different named parties. Because the mail fraud indictment was not returned until April 10, 1987,[4] the return date was very close to the end of the five-year statute of limitations period. Similarly, the false statement indictment was returned on January 22, 1987, charging an event that occurred on January 25, 1982, so that it was filed within three days of the expiration of the statute of limitations.
 
 
 10
 After his indictment, the defendant filed a motion to dismiss alleging pre-indictment delay. This motion was denied without an evidentiary hearing. LaBine argues that this denial was an error. We disagree.
 
 
 11
 The due process clause of the fifth amendment affords some protection to federally indicted defendants claiming oppressive pre-indictment delay. United States v. Lovasco, 431 U.S. 783, 789 (1977). However, as we stated in United States v. Greene, 737 F.2d 572 (6th Cir.1984):
 
 
 12
 This Court previously has stated that "[d]ismissal for preindictment delay is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage."
 
 
 13
 Id. at 574 (quoting United States v. Brown, 667 F.2d 566 (6th Cir.1982) (per curiam), citing United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) and United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)).
 
 
 14
 Here, the defendant was unable to demonstrate that he met either prong of this test. As to prejudice, defendant merely indicated that one office secretary could not be found, and that one of the investors had died. He also made a very generalized claim that documents had been lost or destroyed. He made no attempt to show what the missing secretary would have said that could have helped him. Indeed, two former secretaries and the office accountant were key government witnesses at trial. As to missing or deceased investors, because there were over 600 persons in this category, defendant was hard pressed to show any prejudice resulting from all of them not being available.
 
 
 15
 The claim of missing documents is similarly fragile. Although it is true that the SEC seized the records of the partnership, these records were ultimately turned over to the FBI and were made available to the defendant. The defendant offers no specifics as to which documents of significance were not available or how they might have helped his cause. " 'Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice' stemming from preindictment delay" United States v. Brown, 742 F.2d 359, 362 (7th Cir.1984) (quoting United States v. Jenkins, 701 F.2d 850, 855 (10th Cir.1983)).
 
 
 16
 Although we are not prepared to say that these indictments could not have been returned at an earlier date, we find no benefit accruing to the government as a result of the delay, nor do we find any bad faith on the part of the government. The defendant was running an ongoing business involving hundreds of investors and millions of dollars in investments. The initial concern of both the SEC and the IRS was, to the greatest degree possible, to stop further wrongful acts and to protect the assets of those who had already invested. The SEC proceedings themselves involved protracted court hearings. The initial focus properly was on prevention and protection. Once these goals had been accomplished, it was appropriate to consider prosecution. When a sophisticated, multi-faceted scheme such as was involved here is under investigation, the task is complex. The record reveals no intentional foot-dragging on the part of the government nor any prejudice suffered by defendant that would warrant appellate relief.
 
 III.
 The Sufficiency of the Evidence
 
 17
 Defendant claims there was insufficient evidence to support a conviction on the mail fraud counts and the false statement count. We deal with the latter first, because it requires little analysis. LaBine argues that the evidence fails to show that Michigan National Bank relied upon the false statements, conceding that false statements were made. The problem with this argument is that it is constructed on a false premise, i.e., that reliance is necessary. If, in fact, the false statement was made for the purpose of influencing the action of the bank to approve the loan, "proof [that] the Bank was influenced by or actually relied on the false statement is not necessary for a section 1014 violation." United States v. Copple, 827 F.2d 1182, 1187 (8th Cir.1987), cert. denied, 108 S.Ct. 1046 (1988) (citations omitted).
 
 
 18
 As to the mail fraud counts, the evidence was much more complex. The government presented dozens of witnesses in a trial that lasted several weeks. The defendant would be hard put to argue that, quantitatively at least, there was not considerable damaging evidence introduced. What the defendant really argues is not so much the sufficiency of the evidence as the fact that he was acquitted on counts one through nine, but found guilty on counts ten through twelve, resulting in inconsistent verdicts. Defendant does not label this an inconsistent verdict argument, however, for good reason. The case law is simply nonsupportive of inconsistent verdict arguments:
 
 
 19
 We ... reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake....
 
 
 20
 Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts....
 
 
 21
 United States v. Powell, 469 U.S. 57, 66-67 (1984), accord United States v. Silva, 846 F.2d 352, 357-58 (6th Cir.), cert. denied, 109 S.Ct. 365 (1988).
 
 
 22
 The May 21, 1982, mailing that was implicated in counts ten through twelve was a letter of reassurance to investors. It began:
 
 My dear friends:
 
 23
 All your assets are absolutely safe; they have never been in jeopardy. Our total assets exceed our total liabilities; with your continued support, we can continue:
 
 
 24
 1. our tithing to support approved charities,
 
 
 25
 2. educational and social activities for each of you,
 
 
 26
 3. qualified representatives and staff to service your individual needs, and
 
 
 27
 4. growing to serve only those you recommend.
 
 
 28
 (Government Exhibit 42). The letter proceeded to complain about government harassment and urged each investor to come in for further investment counseling and to remain loyal to Professional Associates.
 
 
 29
 Given even the limited recitation of this defendant's investment activities chronicled earlier, it can hardly be said that the jury lacked ample evidence from which they could conclude that the investors' assets were anything but safe. A good portion of the investors' money was placed in risky, unsecured investments or in investments made directly for the benefit of defendant and his family and friends, with little regard for profitability.
 
 
 30
 When faced with a claim of insufficient evidence, we must view the evidence and all reasonable inferences in the light most favorable to the government. If the evidence is such that we conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is one for the jury. We cannot weigh the evidence or judge credibility independently in deciding whether the district court erred in submitting the case to the jury. Glasser v. United States, 315 U.S. 60 (1942); United States v. Gibson, 675 F.2d 825, 829 (6th Cir.), cert. denied, 459 U.S. 972 (1982). The question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 31
 We have little difficulty in finding that there was sufficient evidence from which the jury could conclude that the May 21, 1982, letter was in furtherance of a scheme to defraud. Defendant's argument that the jury, by acquitting him on counts one through nine, found there was no scheme to defraud is unavailing as we indicated earlier in our discussion of inconsistent verdicts. We hasten to add, however, that we do not agree with LaBine that the acquittal on counts one through nine was, in fact, inconsistent with the guilty verdict on counts ten through twelve.
 
 
 32
 AFFIRMED.
 
 
 
 *
 Honorable David D. Dowd, Jr., United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Codefendant Dion was acquitted by the jury
 
 
 [2]
 The "escrow account" was changed to a "trust account" in an effort to avoid the claim that unregistered securities were being sold
 
 
 [3]
 The tax shelter investment tax credit was ultimately disallowed by the IRS and all investors were assessed back taxes, interest, and penalties
 
 
 [4]
 The original indictment was actually returned on March 26, 1987. The April 10, 1987, indictment was a superseding indictment filed to correct certain technical errors