RENDERED:  OCTOBER 2, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1289-MR

HARVEY MIDDLETON  APPELLANT

v.  APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 18-CR-00067

COMMONWEALTH OF KENTUCKY  APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; KRAMER AND MCNEILL, JUDGES.

KRAMER, JUDGE:  On July 18, 2019, Harvey Middleton was convicted in Harlan Circuit Court of violating KRS[1] 218A.1412 (*i.e.*, trafficking in a controlled substance in the first degree, first offense, fewer than ten (10) pills (oxycodone)). At trial, Middleton effectively raised the defense of entrapment; the jury was

---

[1] Kentucky Revised Statute.

provided an instruction regarding his entrapment defense; and, in finding him guilty, the jury ultimately rejected his defense. On appeal, Middleton now asserts the jury should not have been permitted to decide the issue of entrapment at all. In other words, he claims he should have been acquitted because, in his view, the Commonwealth failed to disprove entrapment, thus entitling him to a directed verdict.

Middleton never raised this point at trial through a directed verdict motion.[2] Instead, Middleton requests palpable error review,[3] the essence of his argument being that the circuit court erred by not raising this point and acquitting him on this basis *sua sponte*. We will grant Middleton's request for palpable error review because the Kentucky Supreme Court has indicated it is proper to do so in this context. *See Mackey v. Commonwealth*, 407 S.W.3d 554, 558 (Ky. 2013) (granting palpable error review of appellant's unpreserved argument that a directed verdict was warranted based on entrapment defense). Upon review, we affirm.

To begin, entrapment is a defense delineated in KRS 505.010, which provides in pertinent part as follows:

> (1) A person is not guilty of an offense arising out of proscribed conduct when:

---

[2] Kentucky Rule of Criminal Procedure (RCr) 10.24 allows a defendant to make a motion for a directed verdict if the Commonwealth has not presented enough evidence to support a conviction.

[3] *See* RCr 10.26.

(a) He was induced or encouraged to engage in that conduct by a public servant or by a person acting in cooperation with a public servant seeking to obtain evidence against him for the purpose of criminal prosecution; and

(b) At the time of the inducement or encouragement, he was not otherwise disposed to engage in such conduct.

In other words, if the defendant is tricked or induced into committing a crime at the behest of the governmental actor and the criminal intent originates with the governmental actor, then a conviction for the crime is inappropriate. *See Alford v. Commonwealth*, 240 Ky. 513, 42 S.W.2d 711 (1931). Conversely, "[i]f the evidence is that the defendant otherwise is disposed to engage in the criminal activity, then inducement or encouragement does not constitute entrapment." *Commonwealth v. Sanders*, 736 S.W.2d 338, 340 (Ky. 1987).

To obtain a *directed verdict* based upon entrapment, a defendant must establish "undisputed" evidence demonstrating a "patently clear" absence of predisposition. *United States v. Harris*, 9 F.3d 493, 498 (6th Cir. 1993); *United States v. Tucker*, 28 F.3d 1420, 1428-29 (6th Cir. 1994). And, in determining whether the evidence was insufficient to establish predisposition, a reviewing court must view the evidence in the light most favorable to the prosecution, resolve all reasonable inferences in favor of the prosecution, and cannot choose between conflicting testimony or make credibility determinations. *United States v. Barger*,

931 F.2d 359, 366 (6th Cir. 1991); *United States v. Silva*, 846 F.2d 352, 355 (6th Cir. 1988); *see also Commonwealth v. Benham*, 816 S.W.2d 186 (Ky. 1991) (similarly delineating the general standard for reviewing a criminal defendant's motion for directed verdict in Kentucky). This is because, where conflicting evidence of substance exists on the question of entrapment, it is a factual issue for a jury to decide. *See Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *Barger*, 931 F.2d at 366; *Commonwealth v. Day*, 983 S.W.2d 505, 508 (Ky. 1999).

"Predisposition . . . focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 62, 108 S.Ct. at 886 (internal quotation marks and citations omitted). Courts have identified five factors relevant to determine whether a defendant was predisposed to commit a crime: (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the government; (3) whether the defendant engaged in criminal activity for a profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome by government persecution; and (5) the nature of the inducement or persuasion applied by the government. *See, e.g., United States v. Khalil*, 279 F.3d 358, 365 (6th Cir. 2002); *United States v. Thomas*, 134 F.3d 975, 978 (9th Cir. 1998); *United States v.*

*Santiago-Godinez*, 12 F.3d 722, 728 (7th Cir. 1993). Although none of these factors alone is determinative, the most important factor is whether the defendant exhibited a reluctance to commit the offense that was overcome by government inducement. *Santiago-Godinez*, 12 F.3d at 728; *United States v. Skarie*, 971 F.2d 317, 320 (9th Cir. 1992); *United States v. McLernon*, 746 F.2d 1098, 1113 (6th Cir. 1984).

Keeping that in mind, the evidence adduced at trial reflected the following. Harvey Middleton and John[4] (a confidential informant) both resided in Harlan County. On the morning of June 13, 2017, John initiated contact with Middleton through Facebook Messenger. The messages the two men exchanged were not introduced as evidence, but John and Middleton both testified at trial regarding the substance of the messages: John asked if Middleton could supply him with "roxies" (his term for oxycodone), and Middleton agreed to do so. Both men also testified they exchanged telephone calls afterward, during which they agreed John would purchase the oxycodone from Middleton at his home later that day.

Unbeknownst to Middleton, John had been working as a confidential informant for the Harlan County Sheriff's Department. After arranging the narcotics transaction, John contacted Sergeant Jason Snelling at the department,

---

[4] We chose to only use the first name of the confidential informant throughout this opinion.

advising him that he could purchase narcotics from Middleton.  Snelling then met with John, with whom he was familiar, and he outfitted John with a digital recorder.

Thereafter, Snelling provided John with a ride to effectuate the transaction.  He could only drive John to the approximate area of Middleton's home, near a "school," because John had never before visited Middleton's home and did not know precisely where Middleton lived – a point that was highlighted during the first two minutes of the audio recording from the controlled buy that was played for the jury at trial.  There, while riding with Snelling, John is heard to say, "I don't want to go too far up, I don't know where he's at."  John's cellular telephone then rings; John remarks that Middleton is calling him and answers the call; and he and Middleton have the following relevant exchange:

> JOHN:  Hey, buddy, I'm at the school.
>
> MIDDLETON:  [Inaudible]
>
> JOHN:  I said I'm at the school right now.
>
> MIDDLETON:  I tried calling you [inaudible].
>
> JOHN:  I tried calling you, too.  I don't get real good service here.  Now how far up are you up here now? What's it?
>
> MIDDLETON:  I'm at, keep looking at your left side, and you'll see a two, a two-mile marker.  I live on Middleton Road.

JOHN: Okay, you gonna be out?

MIDDLETON: I'll [inaudible] with you.

JOHN: Are you gonna be out? My mobile, my phone won't pick up far up through here, but, uh, I'm having my ride drop me off too, man, because you know me and my people don't know you, you don't know them, I like to keep things that way, but um, just give me a general idea about how far up from the school it is, how many minutes.

MIDDLETON: Two miles.

JOHN: Two miles? Alright, brother.

The entire audio recording from the controlled buy was played for the jury. After concluding his telephone conversation with Middleton, John is heard exiting the vehicle; walking for several minutes; and is eventually greeted by Middleton. The two men interact for approximately ten minutes. After exchanging small talk, Middleton is heard telling John that he could get narcotics "all day long"; and that if he did not have what John wanted, he could get it. When John inquired about Subutex, which is another narcotic, Middleton informed him that he could get it for John if he wanted. Consistent with the recording, Middleton also admitted at trial that he sold drugs to John during their interaction – specifically, two oxycodone pills for $100; that he was guilty of trafficking in a controlled substance; and that if John had asked him to get the Subutex for him, he probably would have sold that to him, too.

With that said, we now turn to Middleton's entrapment defense and the five factors outlined above. As to the first factor, there was no evidence adduced either way. Middleton was not asked at trial if he had ever sold drugs prior to this occasion, nor was any evidence presented in that vein.

As to the second factor, the initial suggestion of criminal activity (*i.e.*, drug trafficking) was made by John, who was a confidential informant. The record indicates that John arranged for the purchase of narcotics from Middleton but that he was not specifically directed to do so by the government.

As to the third factor, Middleton contends he accumulated quantities of pain medication in his home, albeit illegally, for his own consumption due to his own issues with pain. Notwithstanding, Middleton sold John two oxycodone pills for $100. Therefore, Middleton did engage in criminal activity for profit.

As to the fourth factor, nothing of record indicates Middleton expressed any reluctance to commit the offense of trafficking. Rather, a reasonable jury could infer that Middleton readily complied with John's request to purchase narcotics from him, considering the audio recording of the sale itself; Middleton's testimony discussed previously; and the relative brevity of Middleton's interaction with John leading up to the sale (*i.e.*, the first time John contacted Middleton about purchasing narcotics from him was the morning of June

13, 2017; and the men completed the narcotics transaction that same day, shortly after 12:30 p.m.).

Lastly, regarding the nature of the inducement or persuasion applied by the government (*i.e.*, the fifth factor enumerated above), Middleton asserts in his brief that he sold John narcotics because he believed John was suffering from pain and because he considered John his friend.

To be sure, tactics found by courts to be excessive in the context of entrapment have included appeals to sympathy, *see Sherman v. United States*, 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958), or "preying upon the love and loyalty of [a] special relationship." *McLernon*, 746 F.2d at 1114. But, to the extent that entrapment can be predicated upon a confidential informant's appeal to sympathy or friendship, the evidence presented at the trial of this matter was less than compelling. Middleton merely testified he "assumed" John was in pain because that was what John had told him on the morning of June 13, 2017, in a Facebook message, and because he knew John had played football in high school and had perhaps sustained injuries. As to the extent of their friendship, John and Middleton acknowledged they had been friends through middle school and high school. But, on the date of their transaction, Middleton was 38 years old, and John did not even know where Middleton lived. Middleton also testified:

COUNSEL: You characterized your relationship as "acquaintances" and you saw each other out. Did you regularly hang out with [] John?

MIDDLETON: No, not after high school.

COUNSEL: Did he regularly call you?

MIDDLETON: No.

COUNSEL: So, was it unusual that he called you that day?

MIDDLETON: Yeah, kinda.

COUNSEL: Okay. Um, and then you said that you knew him to have some football injuries?

MIDDLETON: Yeah, he was a good football player, I thought.

COUNSEL: Okay, so when he called you, what were you thinking?

MIDDLETON: At first, I thought he was just calling to, when he mentioned me, I thought he was just wanting to catch up on, you know, 'cause we ain't seen each other in so long.

As discussed, for Middleton to have been entitled to a directed verdict, we would have to conclude that reasonable minds could not fairly reject his defense of entrapment. Here, viewing the evidence in the light most favorable to the Commonwealth with respect to the factors enumerated above, the totality of the evidence was such that reasonable minds might fairly find Middleton guilty beyond a reasonable doubt. *See Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky.

-10-

1983).  Accordingly, the circuit court's failure to grant Middleton a directed

verdict of acquittal was not error, and we AFFIRM.


ALL CONCUR.


BRIEF FOR APPELLANT:

Karen Shuff Maurer
Assistant Public Advocate
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General
Frankfort, Kentucky