961 F.2d 1580
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Walter TURCZYK, Defendant-Appellant.
 No. 91-3489.
 United States Court of Appeals, Sixth Circuit.
 April 29, 1992.
 
 Before RYAN and SUHRHEINRICH, Circuit Judges, and CHURCHILL, Senior District Judge*.
 PER CURIAM.
 
 
 1
 Defendant appeals from his conviction and sentence for unlawful possession and transfer of a firearm. For the reasons that follow, we affirm.
 
 I.
 
 2
 Special Agent Eric Frey of the Bureau of Alcohol Tobacco and Firearms received information from an informant known as "Pro II" that the defendant Walter Turczyk had made pipe bombs for others in the past. In an unrecorded call, Frey telephoned defendant at his home on July 24, 1990. Frey testified that he told the defendant that he was "a friend of Pro II's" and that he was interested in getting "a couple of items" from him. Defendant indicated that he was on his way out of the house and suggested he call again.
 
 
 3
 On August 2, 1990, Frey and the defendant spoke again. In a recorded conversation Frey indicated that he needed something "that would do a car." During this conversation agent Frey again made reference to "Pro II." Pro II, or Jose Alamo, as it turns out, was a street gang member with an alleged propensity for violence. Alamo was in prison at the time that agent Frey was given information regarding the defendant.
 
 
 4
 On August 6, 1990, in a recorded conversation, Frey called the defendant at which time the defendant indicated that "I got it done for you." The parties met later that day at a McDonald's and defendant was given $100 in exchange for the device. The device was then disassembled and photographed at the Cleveland Police Department.
 
 
 5
 On August 12, Frey returned defendant's phone call. According to Frey's testimony, the defendant asked Frey whether he had used the device and Frey replied that he had not.
 
 
 6
 On August 19, 1990, the defendant returned Frey's phone call. The call was not recorded. According to Frey's testimony, Frey falsely reported to the defendant that he had used the device and that it "had blown up the windows on the car and I didn't wait around to see what kind of damage it did inside of the vehicle."
 
 
 7
 Defendant and Frey conversed at least two additional times, but no additional devices were sold.
 
 
 8
 The defendant testified in his own defense. He said that he met Jose about three years previous and associated with him until "he became involved with the gangs and all his personality became scary." Defendant testified that he met Jose through friends and did not know his surname until it was revealed during trial.
 
 
 9
 As to Jose's influence, the defendant testified that he was in fear of Jose because he was told by Jose that "his friends took care of him and he took care of his friends and if anybody messed around with that, that he would blow them away." Defendant stated that he had learned through television reports that Jose had been arrested for a drive-by shooting and that after the news report he was instructed by his mother that "she didn't ever want to see his face around the house." Defendant testified that eight or nine months after the television report he began receiving telephone calls from agent Eric Frey. He stated that Frey called him "a lot ... sometimes two or three times a week. Sometimes as high as five or six. Maybe more."
 
 
 10
 Defendant testified that the first call was about two weeks before the time that agent Frey testified that he first called. Defendant stated "he had told me that he was a friend of Pro II's and the Pro II said I was into making bombs and he said the Pro II said that I would take care of him." Defendant testified that he told Frey that "I would think about it." The testimony differs as to who initially mentioned the word "bomb."
 
 
 11
 Defendant testified that he finally made a decision to make a device that would only appear to be a bomb, but would not operate, in an effort to terminate the calls from Frey. Defendant stated that he "was afraid that if I didn't do something, that he would tell Pro II and Pro II would get back at me for not taking care of his friends." Therefore, he surmised, he would provide a non-operational device, would later refund the money, and Frey would no longer bother him.
 
 
 12
 Defendant stated that he spent about one hour in his basement making a non-functional device which he later sold to Frey. In the design of the device the defendant allegedly used a "bad ignitor" which did not function and wetted the shotgun shell powder which he inserted into the pipe. He testified that he used an inoperable circuit, bad switches and dead battery. He stated that he attached no diodes which are allegedly necessary to allow the current to flow in one direction for proper functioning.
 
 
 13
 Agent Frey and the detective involved in dismantling the device testified that they did not know if the device would work.
 
 
 14
 On cross, both of the government's explosive experts testified that they did not test the ignitor which was part of the device. One stated that "I tried to activate the circuit. I could not get it to activate because the switches seem to be shorted out, at least one circuit was." He testified that there was a malfunction in the circuitry and that he could not verify that the circuit would function and that it could have been intentionally assembled in that manner, rendering the device inoperative. The government presented testimony that the nine volt battery was tested and registered nine volts.
 
 
 15
 The jury returned a verdict of guilty on both the possession and transfer counts.
 
 
 16
 The court sentenced the defendant to fifteen months, which included a two level departure for the following reason:
 
 
 17
 The Court finds that the defendant is entitled to a downward departure of two levels under the provision of 5K2.12 for coercion. The Court finds that the defendant was of the age of eighteen and that the first inquiry came from the undercover agent using the name Pro Two which had a connotation of an unlawfulness and potential violence. As a consequence, the Court finds that the defendant is entitled to a downward departure of two levels.
 
 II.
 
 18
 Defendant contends that the trial court erred in not granting defendant's motion to dismiss or motion for acquittal. The defendant was charged with violating 26 U.S.C. § 5861(d) and (e) for possession and transfer of an unregistered firearm, namely, a destructive device. Defendant first argues that the government failed to produce any evidence that the item was capable of functioning as a destructive device. Defendant secondly argues that he falls within the exception to the definition, asserting that the device was not designed for use as a weapon since he intended for it to be nonfunctional.
 
 
 19
 The definition of firearm expressly includes a "destructive device." 26 U.S.C. § 5845(a). A destructive device is defined in 26 U.S.C. § 5845(f):
 
 The term "destruction device" means
 
 20
 (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device;
 
 
 21
 (2) [not applicable] ...;
 
 
 22
 (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon....
 
 
 23
 It is not a requisite element of the offense charged that the device be capable of functioning as a destructive device. In U.S. v. Rushcamp, 526 F.2d 1380, 1382 (6th Cir.1975), the Sixth Circuit held that this statute does not demand that the device operate as initially intended. It is enough that it be readily convertible into a destructive device. Id.
 
 
 24
 The government asserts that the record is replete with evidence that the pipe bomb would have functioned as a destructive device. The device was constructed by pouring the powder into a pipe which was enclosed by two end caps. Through one end cap, a model rocket ignitor wire had been placed inside the pipe. The device had been designed so that a lead wire would go into the device and deliver an electric charge which would heat the wire, thereby igniting the smokeless, double base powder. Testimony was presented that the powder was dry.
 
 
 25
 Government witnesses also stated that the electronic devices could have been damaged during the handling of the device by multiple law enforcement officials, and that this would not be unusual. Moreover, testimony was presented that even if the circuitry were removed, the device could function by merely connecting the two wire leads to any electrical source on a car.
 
 
 26
 In reviewing this type of argument, we determine whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. U.S. v. Gresser, 935 F.2d 96, 100 (6th Cir.1991), cert. denied, Singer v. U.S., 116 L.Ed.2d 195 (1991). Applying this standard, we find that the jury could properly conclude that the device was readily convertible into a destructive device.
 
 
 27
 Defendant secondly asserts that the device falls within one of the exceptions to the definition of destructive device, namely, that the definition "shall not include any device which is neither designed nor redesigned for use as a weapon." 26 U.S.C. § 5845(f).
 
 
 28
 The applicability of the exception was suggested to the jury in closing arguments. Moreover, the court instructed the jury that the term destructive device shall not include any device which is neither designed nor redesigned as a weapon. No objection to the instruction was made.
 
 
 29
 We conclude that the issue of whether the exception applies in this case was properly presented to the jury. There was sufficient evidence upon which the argument could be rejected and, therefore, we will not disturb the verdict of the jury.
 
 III.
 
 30
 Defendant argues that the government's failure to provide the identity and address of an informant should have resulted in a mistrial. The standard for reviewing the district court's denial of a motion for mistrial is whether the district court abused its discretion. U.S. v. Cordell, 924 F.2d 614, 617 (6th Cir.1991).
 
 
 31
 By interrogatory, defendant had requested the names and current addresses of all persons who made any statements to the government concerning information relevant to the charges. Subsequently, by letter, defendant specifically requested this information as to "Pro II". However, the defendant did not move the court to compel disclosure of the identity of Pro II.
 
 
 32
 The surname and location of "Pro II" were not revealed until the defendant's cross-examination of agent Frey. Defendant asserts that he was denied due process and his Sixth Amendment right of confrontation.
 
 
 33
 In Roviaro v. U.S., 353 U.S. 53 (1957) the Supreme Court outlined a balancing test to determine whether the disclosure of an informant is proper:
 
 
 34
 We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.
 
 
 35
 Id. at 62.
 
 
 36
 An informant's identity must be revealed, however, if he testifies at the trial of the accused. Even when he does not testify, disclosure is proper if it "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." Id. at 60-61. See also, U.S. v. Hanna, 341 F.2d 906, 907 (6th Cir.1965). The defendant bears the burden of establishing how disclosure of the informant's identity would substantially assist him. U.S. v. Moore, 954 F.2d 379, 384 (6th Cir.1992).
 
 
 37
 We conclude that the defendant failed to satisfy his burden under Roviaro. Any contribution to the defense is speculative. Moreover, the prosecution did not rely on the informant in any way to establish the commission of the offense. We are satisfied that the district court did not abuse its discretion in refusing to grant a mistrial.
 
 IV.
 
 38
 Defendant argues that the lower court erred in failing to enter judgment as a matter of law based upon the defense of entrapment. He also argues that the court erred in admitting certain evidence of predisposition.
 
 
 39
 The test for entrapment is "whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who is already predisposed to do so." U.S. v. Moore, 916 F.2d 1131, 1136 (6th Cir.1990). A "claim of entrapment as a matter of law must be based on a failure by the Government to prove predisposition." U.S. v. Silva, 846 F.2d 352, 355 (6th Cir.1988), cert. denied, 488 U.S. 941 (1988). In analyzing predisposition, several factors are relevant:
 
 
 40
 [T]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducements supplied by the Government.
 
 
 41
 Id. at 355 (quoting U.S. v. McLernon, 746 F.2d 1098, 1112 (6th Cir.1984)).
 
 
 42
 "In determining whether there was no predisposition as a matter of law, we are required to view the evidence in the light most favorable to the Government, and resolve all reasonable inferences in favor of the Government." Silva, 846 F.2d at 355.
 
 
 43
 The question of entrapment is generally one of fact and, accordingly, left to the sound discretion of the jury. Mathews v. U.S., 485 U.S. 58, 63 (1988). Where the defendant claims entrapment as a matter of law, " 'the testimony and facts must be undisputed.... Furthermore, the undisputed evidence must demonstrate a 'patently clear' absence of predisposition. If either of these elements is missing, then the predisposition question is left for the jury to decide.' " U.S. v. Barger, 931 F.2d 359, 366 (6th Cir.1991) (quoting United States v. Pennell, 737 F.2d 521, 534 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985)).
 
 
 44
 The government submits that the transcript of the first recorded telephone conversation shows a willing participation on the part of the defendant to commit the offense charged. At a minimum, the tapes show familiarity with the terminology, construction and destructive capability of pipe bombs. Such knowledge is pertinent. In Silva, the Sixth Circuit found that "a reasonable inference could be drawn from [the defendant's] familiarity with drug transaction terminology and procedure that [the defendant's] predisposition predated the first recorded conversation...." 846 F.2d at 356.
 
 
 45
 Objective evidence of reluctance is minimal to nonexistent. Moreover, we do not find sufficient undisputed evidence to demonstrate a "patently clear" absence of predisposition. Barger, 931 F.2d at 366. As a result, we are satisfied that the jury's implicit rejection of the entrapment defense cannot be disturbed.
 
 
 46
 Defendant has also argued that the court erred in admitting certain evidence regarding predisposition. Specifically, the court allowed Agent Frey to testify that shortly before the time of trial he had obtained information from a person, identified only as Ted, who stated that he had purchased a pipe bomb from the defendant. The court also allowed testimony regarding the fact that defendant and his mother had provided to Parma, Ohio police officers, sketches, drawings, and a fuse which the defendant had in his possession, or under his control three years earlier when he was 14 or 15 years old.
 
 
 47
 When reviewing the admissibility of evidence admitted by the trial court, we examine whether the court abused its discretion. U.S. v. Zipkin, 729 F.2d 384, 389 (6th Cir.1984).
 
 
 48
 The testimony as to "Ted" was elicited from Frey by defense counsel on cross-examination. No objection was lodged. In fact, counsel went further to elicit the fact that "Ted" and "Pro II" were in prison.
 
 
 49
 Where defense counsel makes a tactical decision, the defendant cannot predicate a motion for mistrial on any supposed prejudice that results. U.S. v. Francis, 646 F.2d 251, 261 (6th Cir.1981), cert. denied, 454 U.S. 1082 (1981).
 
 
 50
 As to the admission of items from defendant's youth, the court allowed them only for the purpose of showing defendant's predisposition and instructed the jury that they do not constitute the commission of a crime. Because defendant chose to raise the defense of entrapment, he subjected himself to "an appropriate and searching inquiry into his own conduct and predisposition." Sherman v. U.S., 356 U.S. 369, 373 (1958). We find that the court did not err in this regard.
 
 V.
 
 51
 Defendant argues that the court should have departed downward further than it did because the defendant is young, has no criminal history, has no record of juvenile adjudications or arrests, is allegedly pursuing a college education and is employed on a part-time basis with several area employers.
 
 
 52
 In reviewing claims that the court should have departed downward from the guidelines, the sentence shall be affirmed unless the district court was clearly erroneous in imposing the sentence. U.S. v. Smith, 918 F.2d 664, 669 (6th Cir.1990), cert. denied, 111 S.Ct. 1088 (1991).
 
 
 53
 "An appeal of a district court's failure to downwardly depart from the Guidelines is limited. An otherwise valid sentence is not appealable on the grounds that the defendants feel certain factors were not taken into account by the Guidelines." Id. at 667.
 
 
 54
 Upon review, we are satisfied that the guidelines account for all of the special considerations forwarded by the defendant. We conclude that the sentence is neither clearly erroneous nor contrary to law and affirm on this issue.
 
 VI.
 
 55
 Based on the foregoing, the conviction and sentence are affirmed.
 
 
 
 *
 Honorable James P. Churchill, Senior District Judge for the Eastern District of Michigan, sitting by designation